### No. 20,317.

CARRIE W. GIRARDEY, *Appellant*, v. VICTOR F. GIRARDEY et al., *Appellees*.

#### SYLLABUS BY THE COURT.

1. VERDICT AND FINDINGS—*Verdict According to Voluntary Finding Contravening Instruction—Judgment on Findings Properly Returned—No Error*. In an action on a promissory note the defendant claimed a credit of $2000. The court instructed the jury that if they found stated facts the credit should be allowed. In answer to special questions the jury found the facts necessitating the credit, but voluntarily appended to one of the answers a statement which presumably they believed justified them in disallowing the credit, and they returned a verdict for the full amount of the note. The statement concerned a matter not submitted to the jury, and if given effect would contravene the instruction. *Held*, the district court had authority to allow the credit when rendering judgment, without giving the plaintiff the option of a new trial.

2. PRINCIPAL AND AGENT—*Agent to Receive Funds—Appropriation of Funds for Services—Payment of Debt to Another—Principal Not Bound*. The defendant's agent to receive certain funds while acting as such agent gave the plaintiff, who was his wife, $2000 of the funds, in payment of a personal debt which the agent owed the plaintiff. The plaintiff, who was cognizant of all the facts, claimed the agent paid himself for services rendered the defendant in connection with the fund and then paid her. The agent had no agreement with the defendant respecting compensation, the amount of it, when it should be

paid, or how it should be paid. When apprised of what had been done the defendant demanded that the plaintiff give him credit for $2000. *Held*, the defendant was entitled to the credit.

Appeal from Kiowa district court; GORDON L. FINLEY, judge, and PRESTON B. GILLETT, judge *pro tem.* Opinion filed February 10, 1917. Affirmed.

*John W. Davis,* of Greensburg, for the appellant.

*J. N. Haymaker, A. V. Roberts,* and *W. D. Jochems,* all of Wichita, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover on a promissory note. The defendant claimed a credit which was not allowed by the jury, but which was allowed by the court when judgment was rendered. The plaintiff appeals.

The defendant was a member of a mercantile firm at Haviland, Kan. In March, 1911, he sold his interest in the firm. Among the assets of the firm were a large number of notes and accounts, which, under the contract of sale, he was to assist in collecting. In July, 1911, he went to Los Angeles, Cal., pretended to organize a corporation there known as the Anton-Myerwich Company, and assigned the notes and accounts to the dummy corporation. He then transmitted the notes and accounts to a bank in Wichita, Kan., which undertook to collect them. Proceeds of collections were remitted by draft to the Anton-Myerwich Company. The defendant's brother, Leo Girardey, who was the plaintiff's husband, resided in Los Angeles. He participated in the sham corporation scheme, and received the drafts sent to the Anton-Myerwich Company, which had no capital stock, no directors, no officers, and no place of business except a vacant room without a sign on the door. Leo Girardey cashed the drafts and deposited the proceeds to his personal account in a Los Angeles bank. The Anton-Myerwich Company was invented in July, 1911. In August, 1911, Leo Girardey received and cashed drafts payable to the Anton-Myerwich Company to the amount of $6844, and received a draft for $1000 direct from his brother. Out of these receipts Leo Girardey sent a total sum of $3000 to three of Victor Girardey's relatives in Texas, in obedience to Vic-

tor's directions.   In December, 1911, and before Christmas, the plaintiff purchased a mortgage for $3750 on valuable property in Los Angeles.   Two thousand dollars of the money was furnished by Leo, out of the money he had received in the manner described.   The plaintiff claimed her husband owed her much money, and testified as follows:

"Q.  Did you mean to say that you got a part of that money from Leo? A.  He gave me that money.  He gave me that money.  He paid me back money that he had borrowed from me.

.     .     .     .     .     .     .     .     .     .     .     .     .     .

"Q.  Now when you answered that $2000 of this money was money that Leo got from Vic, did you mean that it was money that Leo got from Vic or that Leo got from the Anton-Myerwich Company which he had organized?  A.  Well, that was it.

"Q.  Well, explain right here what you did mean—from Vic or from the Anton-Myerwich Company?  A.  I mean from the Anton-Myerwich Company, the money that had been sent him to transact the business, from the Anton-Myerwich Company, which is the same thing as Vic, I suppose, because he was the whole company.

.     .     .     .     .     .     .     .     .     .     .     .     .     .

"Q.  Then you did n't mean Victor had sent Leo that money and Leo handed it to you?  A.  No, sir; it was from the Anton-Myerwich Company he got the money.  He took the money out because he was managing the business, and he paid himself.  When he was paying all this other money, he saw there was no money going to be left, I suppose, and he paid himself and paid me—he had the graciousness to pay me two thousand dollars of the thousands of dollars he owed me.

.     .     .     .     .     .     .     .     .     .     .     .     .     .

"Q.  He gave you two thousand dollars of money he had got from Vic and told you it was his?  A.  Told me it was his money, and it was two thousand dollars.  He wanted me to buy this property and I says I have n't got the money. He says I can help you out with two thousand dollars; I have worked for Vic for this long time and I haven't got a cent's pay; he is checking out all this money to these people, and I am going to see where I get my money as I have done all this work for him and I must be paid, and he paid himself I suppose, and he gave it to me, paid me back for the money that he had gotten from me, and that he used in the interest of Vic.

.     .     .     .     .     .     .     .     .     .     .     .     .     .

"Q.  Well, would you now, then, in the light of my questions, would you now say that two thousand dollars of the money that went into the purchase of the Flint property came from Victor Girardey through Leo, or did it come from the Anton-Myerwich into Leo's hands?  A. It came from the Anton-Myerwich Company, because that was the money.  It was all sent out to the Anton-Myerwich Company, and that

is the only way he had of getting it, through transacting that business and paying himself."

In January, 1912, the plaintiff sent for Victor and he went to Los Angeles. The plaintiff testified as follows:

"Q. Now, Mrs. Girardey, did Victor come out to Los Angeles to your house in January, 1912?  A. Yes.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. You sent for him?  A. Yes. My husband was not attending to business. He was drinking.

"Q. Who was drinking?  A. ' My husband; and I was' interested in Vic, to know that his business was being attended to.  .  . . .   Vic's letters would come and Leo would come in and would not look at them; just throw them down, and I would pick them up and read them, and I found that there was business that ought to be attended to, I thought.

.   .   .   .   .   .   .   .   .   .   ./ .   .   .   .   .   .

Q. Had you bought the Flint property?  Had you bought the Flint property before Victor came?  A. The $3700.

"Q. You bought that before Victor came?  A. Before Victor came."

On the occasion of this visit to Los Angeles the defendant asked credit for this $2000. The plaintiff's version of the conversation follows:

"Q. Did Victor ever ask you to give him credit for two thousand dollars?  A. Yes.

"Q. Now, where was he when he asked you that?  A. In my room— in my apartments at the Knickerbocker Hotel.

"Q. In Los Angeles?  A. Yes.

"Q. What reply did you make?  A. I told him I would give him a receipt when he paid my money, when he paid me what he owed me. He wanted a receipt for two thousand dollars which Leo, I suppose, owed him; I don't know; but then, anyway, he wanted me to give him a receipt for two thousand dollars which I had not received.

"Q. What reason did he give for demanding that you receipt him or credit him with two thousand dollars at that time?  A. Well, he said that there was two thousand dollars unaccounted for with Leo."

The defendant testified as follows:

"Q. You never had any settlement, did you?  A. Sure we had a settlement.

"Q. What kind of a settlement?  A. We had a settlement in 1912, settlement in 1912 when I went out to California, and that is when they took this money and was accounting for it  .  .  .   and when it got over twenty-eight or twenty-nine hundred dollars Carrie spoke up and said it was not twenty-five hundred they took for this lot, and Leo told her it was, and then they went on with some other figures, and then she turned around and said that there was not but two thousand taken

for this lot; . . . and then I told her to give me a receipt for the two thousand dollars, and she said her word was as good as mine and she would not give me a receipt at all; she would not give me anything."

The jury returned the following special findings of fact:

"12. Did not the plaintiff herein, Carrie W. Girardey, know that Leo Girardey had received from Victor F. Girardey a large sum of money after the execution of the note and mortgage sued on herein? A. She did know.

"13. Did she not receive the benefit of a part of this money? A. She did, but not as a payment on this $5000 note, but as earnings of Leo Girardey.

"14. If you answer the last question affirmatively, then state the amount thereof. A. $2000."

The court gave the defendant credit for $2000, with interest from January 1, 1912, and the assignment of error is that the court sustained the defendant's motion for the credit. The plaintiff's argument is that the jury's voluntary statement annexed to the answer to question 13, "but not as a payment on this $5000 note, but as earnings of Leo Girardey," was a finding that the sum of $2000 received by the plaintiff was in fact earned by Leo and belonged to Leo; that this voluntary finding of the jury is consistent with the general verdict; and that it could not in effect be set aside and the amount of the general verdict reduced without giving the plaintiff the option of a new trial.

The plaintiff is foreclosed from making the contention just stated. The question whether or not Leo had earned $2000 by working for Victor, which he had the right to withdraw from the funds in his hands, was not submitted to the jury. On the other hand, the court instructed the jury as follows:

"You are instructed that if you find that Leo Girardey paid to the plaintiff the sum of $2000 from money received by the Anton-Myerwich Company, which in fact belonged to Victor Girardey, to her knowledge, in payment of money that Leo Girardey had borrowed from the plaintiff, then the defendants Victor F. Girardey and Hattie C. Girardey are entitled to a credit for such sum."

The plaintiff submitted to this instruction. She did not complain of it in any way to the district court, offered no instruction embodying a different principle, does not complain of the instruction in this court, and it became and is the law of the case. Besides this, it is good law.

The plaintiff's version of the transaction between herself

and her husband amounts to this: Leo had in his possession a bag of money which belonged to Victor, and which Carrie knew belonged to Victor. In Carrie's presence Leo put his right hand into the bag and took out $2000. The money was Victor's. Leo put the $2000 into his left hand and said, I pay myself. Then the money was his. With his left hand he gave the money to Carrie and said, I pay you. Then the money was hers. The law does not countenance such a proceeding. If Victor had not been indebted to Carrie he could have recovered the money. Being indebted to her, he was entitled to have it credited on his note.

The legal principle involved is a derivation from the ancient moral principle that a man can not serve two masters. The first duty of an agent is loyalty to his principal, whom he must serve with integrity and fidelity. The agent antagonizes his principal when he undertakes to act for his principal and for himself in the same transaction. Just what physical, mental and moral services Leo rendered in fabricating the Anton-Myerwich Company the evidence does not disclose. He never had possession of a single note or account and had nothing whatever to do with the collection of any note or account. He received several drafts, deposited them to his own credit, and made a few remittances. His wife told how he handled the Anton-Myerwich Company mail. He had no express contract for compensation. There is no evidence in the record that his services were reasonably worth $2000 or any other sum. Conceding that he was "employed," he "worked" from July until in December. He then decided his principal owed him for his services about twenty-five per cent of the money he had received. The decision was coincident with a desirable bargain presented to his wife. He executed the decision by giving the money to his wife to pay his own debt. She was cognizant of all the facts.

As long ago as 1830 the supreme court of judicature of New Hampshire stated the principle involved as follows:

"When an agent is employed to receive money for his principal, he can not appropriate the money received to pay what may be due to him from the principal, without the consent of the latter." (*Morse v. Woods,* 5 N. H. 297, syl. ¶ 2.)

In the case of *Clark v. Lee,* 14 Iowa, 425, decided in 1862,

Girardey v. Girardey.

an agent holding a power of attorney relating to land, conveyed a portion of the property to his wife, to secure himself for advancements made in connection with the trust. The court said:

"Where a trustee conveys a portion of the trust property to his own wife, for his own use and benefit, a court of equity will not permit him to hold the property so conveyed as a security for moneys advanced for the *cestui que trust* in the execution of the trust." (Syl.)

In the case of *Englehart v. Peoria Plow Co.*, 21 Neb. 41, decided in 1887, the agent of a harvesting machine company took a note for the price of a machine which he sold. He indorsed the note, took it himself for commissions he had earned, and passed it to another. The court held that the title of the machine company to the note was not devested, and deemed it sufficient to quote as authority a passage from the writings of the accomplished Story, which is worthy of reproduction here:

"In this connection, also, it seems proper to state another rule, in regard to the duties of agents, which is of general application, and that is, that in matters touching the agency, agents can not act, so as to bind their principals, where they have an adverse interest in themselves. This rule is founded upon the plain and obvious consideration, that the principal bargains, in the employment, for the exercise of the disinterested skill, diligence, and zeal of the agent, for his own exclusive benefit. It is a confidence necessarily reposed in the agent, that he will act with a sole regard to the interests of his principal, as far as he lawfully may; and, even if impartiality could possibly be presumed on the part of an agent, where his own interests were concerned, that is not what the principal bargains for; and, in many cases, it is the very last thing which would advance his interests. . . . If, then, the seller were permitted, as the agent of another, to become the purchaser, his duty to his principal and his own interest would stand in direct opposition to each other; and thus a temptation, perhaps, in many cases, too strong for resistance by men of flexible morals, or hackneyed in the common devices of worldly business, would be held out, which would betray them into gross misconduct, and even into crime. It is to interpose a preventive check against such temptations and seductions, that a positive prohibition has been found to be the soundest policy, encouraged by the purest precepts of Christianity. This doctrine is well settled at law; but it is acted upon in courts of equity to a much larger extent, not only in cases of persons, confidentially intrusted with the management of the property of others; but in cases of other relations of a confidential nature, involving the rights and interests of the employer." (Story on Agency, 9th ed., § 210.)

Further citation of authority is unnecessary.

There is this difference between passing title to money and passing title to other kinds of property. Money lacks means

of identification. But when it is identified by knowledge of the taker of the source from which it comes there is no difference.

In this instance, no right of an agent to retain money by virtue of a lien for compensation, or right to deliver possession, lawful to the extent of a lien for compensation, was involved. The agent took the law into his own hands, determined that he had a right to compensation, determined the amount of his compensation, determined the date on which compensation was payable, paid himself, and with the same money paid a personal debt to another who was apprised of what he was doing. The recipient of the fund was privy to this flagrant breach of trust and can not profit by it under any recognized principle of law or equity. The breach of trust was not condoned by ratification, because the evidence of the plaintiff herself was .that the defendant demanded credit for the money which enabled her to buy the mortgage on the Flint property.

The instruction to the jury which has been quoted applied the principles which have just. been discussed to the evidence which had been adduced. But, whether justified or not, the instruction was and is accepted as the law of the case. The instruction related to the credit of a specified sum of money on the plaintiff's claim. The jury had no authority to evade it or to disregard it, and the court had authority to allow the credit by virtue of the special findings properly returned, which controlled the general verdict.

The judgment of the district court is affirmed.